UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAMES M. DOWNING,                 )  No. CV-05-177-CI
                                  )
                Plaintiff,        )  MEMORANDUM AND ORDER DENYING
                                  )  PLAINTIFF'S MOTION FOR SUMMARY
v.                                )  JUDGMENT, GRANTING DEFENDANTS'
                                  )  MOTION FOR SUMMARY JUDGMENT IN
DEBBIE CLINTON, AHCC Health       )  PART, DISMISSING FEDERAL CLAIMS
Care Manager; MARGIE SANFORD,     )  AND DECLINING SUPPLEMENTAL
Monroe Corrections Center         )  JURISDICTION OF STATE CLAIMS,
ARNP; J. David Kennedy, M.D.,     )  *INTER ALIA*
Monroe Corrections Center         )
Medical Director; WASHINGTON      )
STATE DEPARTMENT OF               )
CORRECTIONS,                      )
                                  )
                Defendants.       )
_____ )

     Before the court are cross-Mdotions for Summary Judgment. (Ct.

Rec. 56, 61.)[1]  Plaintiff, James M. Downing, is represented by

Breean L. Beggs, John D. Sklut, and Terri D. Sloyer, Center for

Justice.  Department of Corrections (DOC) personnel Clinton,

Sanford, Kenney and Clarke (Secretary of DOC) are represented by

_____

     [1] The court has attempted to reconcile CM/ECF (electronic case

filing) identifiers for the pleadings and exhibits with the

sometimes conflicting identifiers used by the parties.

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
JURISDICTION OF STATE CLAIMS - 1

1  Sara J. Olson and Brian G. Maxey, Washington State Assistant

2  Attorneys General.  The matter was heard without oral argument on

3  August 28, 2006.

4                          **I. BACKGROUND**

5      James Downing (Plaintiff) was housed at Monroe Correctional

6  Complex (MCC) in the Western District of Washington, or Airway

7  Heights Correction Center (AHCC) in the Eastern District of

8  Washington, at the time of the events alleged in his Complaint. (Ct.

9  Rec. 1.)   He seeks injunctive relief, as well as financial

10  indemnification, for alleged constitutional violations pursuant to

11  42 U.S.C. § 1983.  He claims prison officials failed to provide

12  necessary medical treatment at AHCC and MCC in violation of his

13  Eighth Amendment and Fourteenth Amendment rights.  He also claims

14  medical negligence under state law.

15      Plaintiff filed an initial complaint, with jury demand, against

16  Debbie Clinton, Margie Sanford and J. David Kenney, M.D.,

17  (Defendants) on June 9, 2005.  (Ct. Rec. 1.)  Plaintiff amended his

18  Complaint on July 15, 2005, to include the Washington State

19  Department of Corrections (DOC).  (Ct. Rec. 2.)  He then moved to

20  file a Second Amended Complaint to add state claims.  The court

21  denied his request to amend, granted his praecipe to dismiss marital

22  communities and directed Plaintiff to show cause why the DOC should

23  not be dismissed as a party.  (Ct. Rec. 32.)  Plaintiff filed a

24  motion for reconsideration, and the court granted leave to file a

25  Second Amended Complaint on June 29, 2006.  (Ct. Rec. 44.)  In his

26  Second Amended Complaint filed June 30, 2006, Plaintiff withdrew DOC

27  as a party, added Harold Clarke, Secretary of DOC as a party, and

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
JURISDICTION OF STATE CLAIMS - 2

1  added state claims for negligence. (Ct. Rec. 45.)

2      In his Second Amended Complaint, Plaintiff claims: (1) the DOC
3  Offender Health Plan (OHP) is unconstitutional; (2) Defendant
4  Clarke's adoption and supervision of the unconstitutional OHP
5  violates Plaintiff's Eighth Amendment right to adequate medical
6  care; and (3) Defendants Clinton, Sanford and Kenney intentionally
7  failed to provide necessary medical treatment for his hernia,
8  Morton's neuroma, shoulder pain and Hepatitis C, demonstrating
9  deliberate indifference for Plaintiff's constitutional rights in
10  violation of the Eighth Amendment. (Ct. Rec. 45 at 3-5.) Plaintiff
11  asks the court to take supplemental jurisdiction over state
12  negligence claims. Plaintiff requests a declaratory judgment that
13  the OHP is unconstitutional. He also seeks to enjoin all Defendants
14  from denying him the medically necessary treatment of surgery for
15  his hernia and foot, and diagnostic analysis and treatment of his
16  shoulder. He asks for monetary damages, attorney fees and costs.
17  (Ct. Rec. 45 at 10-11.)

18      In their Answer, Defendants plead the affirmative defenses of
19  Eleventh Amendment immunity and qualified immunity. They also
20  allege contributory negligence on the part of Plaintiff, and assert
21  that Plaintiff has failed to state a claim under 42 U.S.C. § 1983.
22  Regarding the state law claims, Defendants contend Plaintiff failed
23  to follow the State tort claims process. Defendants move for
24  dismissal of the Complaint and claims with prejudice. (Ct. Rec. 47
25  at 7-8.) In their summary judgment pleadings, Defendants also argue
26  none of them personally participated in Plaintiff's medical care
27  and, because Plaintiff has failed to claim any physical injury, he

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
JURISDICTION OF STATE CLAIMS - 3

1  is barred from claiming mental and emotional injury. (Ct. Rec. 57

2  at 3.)  The court has reviewed the parties' motions, memoranda,

3  responses, replies, and accompanying exhibits, admitted depositions

4  and records.

## II. DISCUSSION

**A.  Legal Standard**

7      Summary judgment allows the parties to avoid unnecessary trials

8  when there is no dispute as to the facts before the court. *Zweig v.*

9  *Hearst Corp.*, 521 F.2d 1129 (9th Cir. 1975), *cert. denied*, 423 U.S.

10  1025 (1975).  Summary judgment shall be granted where "there is no

11  genuine issue as to any material fact and . . . the moving party is

12  entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c);

13  *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978).

14  Under FED. R. CIV. P. 56, a party is entitled to summary judgment

15  where the documentary evidence produced by the parties permits only

16  one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247,

17  106 S.Ct., 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th

18  Cir. 1985).  The moving party bears the initial burden of informing

19  the court of the basis of its motion and identifying evidence of

20  record it believes demonstrates the absence of "a genuine issue of

21  material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

22  FED. R. CIV. P. 56 does not require the moving party to support its

23  motion with affidavits or other documents <u>negating</u> the opponent's

24  claim." *Id.*  If the moving party satisfies its initial burden, Rule

25  56(e) requires the party opposing the motion to respond by

26  submitting evidentiary materials that designate "specific facts

27  showing that there is a genuine issue for trial." *Matsushita Elec.*

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
JURISDICTION OF STATE CLAIMS - 4

*Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

An opponent cannot rest on denials or mere allegations unsupported by factual data or in a pleading. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989). The Ninth Circuit has stated that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products. Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). Plaintiff cannot rely an conclusory allegations in an affidavit. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). A trial court considers the actual probative value of the evidence necessary to support liability. Facts must be presented in evidentiary form. *Anderson*, 477 U.S. at 254. Plaintiff must establish each element of his claim with "significant probative evidence tending to support the complaint." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted).

Only disputes over facts that might affect the outcome of the case under the applicable law will preclude entry of summary judgment. Factual disputes that are irrelevant will not be counted. *Anderson*, 477 U.S. at 250. In determining if summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Id.* at 255. Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *Id.* at 250. Conversely, any doubt about the existence of any issue of material fact requires denial of the motion. *Id.* at 255. Where there is a complete failure

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 5

of proof concerning an essential element of a party's case where he has the burden of proof, all other facts are rendered immaterial, and the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322-23.

Plaintiff, as the party bearing the burden of proof at trial, must inform the court of the basis of its motion and identify portions of the "pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any," which he believes demonstrates the absence of a "genuine issue of material fact." FED R. CIV. P. 56(c). Both parties must respond to the respective motions for summary judgment with evidence of specific facts in the form of admissible discovery material in support of its contention that the dispute exists. *Id*. The opposing party may not rely upon allegations or denials and must show there is more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. On summary judgment, facts and inferences drawn from the facts must be viewed in the light most favorable to the opposing party. To survive the moving party's motion, the non-moving party needs to present evidence from which a jury might return a verdict in his favor. *Anderson*, 477 U.S. at 255.

**B.   Statement of the Facts**

Both parties filed a Statement of Facts with their Motion for Summary Judgment. (Ct. Rec. 58, 62.) Plaintiff supports his Statement of the Facts with his Declaration and attached exhibits, (Ct. Rec. 68), copies of the OHP (Ct. Rec. 64, Ex. 2, 3), and Dr. Joe Goldenson's Declaration (Ct. Rec. 64, Ex. 4), with his expert report (Goldenson Report) dated October 21, 2005, attached as

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
JURISDICTION OF STATE CLAIMS - 6

Exhibit B to his Declaration.   Dr. Goldenson, a California physician, summarizes generally Plaintiff's four medical conditions, his review of Plaintiff's medical records and treatment and his findings from his examination of Plaintiff.   Defendants support their Statement of Facts with their Declarations, copies of the OHP, Plaintiff's medical records and reports from AHCC and MCC.   (Ct. Rec. 56, 57, 89, 97.)   Plaintiff also filed a Statement of Disputed Facts.   (Ct. Rec. 90.) The following facts, except where noted, are not controverted:

1.   Plaintiff has been in the custody of DOC since April 21, 2000.   (Ct. Rec. 58 at 1; Ct. Rec. 90 at 1.)

2.   Plaintiff was at AHCC from October 6, 2003, through November 18, 2004.

3.   Plaintiff was transferred to MCC on November 18, 2004.

4.   Plaintiff was imprisoned at either AHCC or MCC from October 6, 2003, through the time of filing the Complaint on June 9, 2005.   (Ct. Rec. 58 at 2; Ct. Rec. 1.)

5.   Defendant Clinton was the Health Care Manager (HCM) at AHCC during the relevant times.   She is a licensed Physician's Assistant (PA), and performed duties on an "as-needed" basis at AHCC.   She had the authority to provide Level I care as defined by the Offender Health Plan (OHP); Level II care required the approval of the Care Review Committee (CRC).[2]   (Ct. Rec. 58, Ex. B.)   She reviewed, investigated and responded to Level II grievance appeals

_____

[2] The levels of care (Level I, II and III) as defined by the OHP are described *infra* at 19.

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 7

1  filed by prisoners.  Defendant Clinton had occasion to see Plaintiff

2  when performing "as-needed" duties, but was not his Primary Care

3  Provider (PCP).

4      6.  Defendant Sanford was an advanced registered nurse

5  practitioner (ARNP), employed at MCC.  She was Plaintiff's PCP at

6  MCC during the relevant time, and had the authority to provide Level

7  I care.  She did not have the authority to administer Level II care

8  without approval of the CRC.  (Ct. Rec. 58, Ex. C.)

9      7.  Defendant Kenney was the Medical Director at MCC during

10 relevant time.  He had never been Plaintiff's PCP, and had never

11 personally treated Plaintiff.  Defendant Kenney was a member of the

12 CRC which reviewed cases for MCC, and was a member of the statewide

13 Hepatitis C Care Review Committee.

14     8.  "Medical necessity" is defined in the OHP as:

15     Care that meets one or more of the following criteria for
       a given patient at a given time:
16
       -    is essential to life or preservation of limb, OR
17     -    reduces intractable pain, OR
       -    prevents significant deterioration of [Activities of
18          Daily Living] ADLs, OR
       -    is of proven value to significantly reduce the risk
19          of one of the three outcomes above (e.g. certain
            immunizations), OR
20     -    immediate intervention is not medically necessary,
            but delay of care--including beyond the offender's
21          release--would make future care or intervention for
            intractable pain or preservation of ADLs
22          significantly more dangerous, complicated or
            significantly less likely to succeed, OR
23     -    listed in "Level 1" in the Washington DOC Levels of
            Care and Venues Directory, OR
24     -    described as part of the Departmental Policy or
            health care protocol or guideline and delivered
25          according to such Policy, protocol, or guideline, OR
       -    from a public health perspective, is necessary for
26          the health and safety of a community of individuals
            and is medically appropriate, but may not be
27          medically necessary for the individual.

28 MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
   JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
   IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
   JURISDICTION OF STATE CLAIMS - 8

1  (Ct. Rec. 64, Ex. 2.)

2      9.   "Activities of Daily Living (ADLs)" are defined in the OHP

3  as "activities related to personal care and include bathing or

4  showering, dressing, getting in or out of bed or a chair, using the

5  toilet, and eating."  (*Id.*)

6      10.  "Intractable pain" is defined as:

7      Pain which is moderate to severe in intensity AND frequent
       or constant in occurrence AND physiologically plausible
8      based on objective evidence from examination or tests AND
       unresponsive to conservative measures including, but not
9      limited to:  reasonable trials of various analgesics;
       discontinuation of potentially exacerbating activities
10     such as sports and work; physical therapy when
       appropriate; reasonable trial of watchful waiting when
11     appropriate.

12  (*Id.*)

13     11.  Under the OHP, if a PCP determines there is a Level II

14  condition, she or he presents the case to the CRC or Health Services

15  Director (HSD) for classification as Level I or III.

16     12.  Plaintiff has four medical conditions:  Hepatitis C,

17  ventral hernia, Morton's neuroma of the left foot, and right

18  shoulder pain.  (Ct. Rec. 64 at 6-7.)

19                          **Hepatitis C**

20     13.  Plaintiff has a 20-year history of Hepatitis C.  (Ct. Rec.

21  68, Downing Decl., Statement 2; Ct. Rec. 64, Ex. 4, Goldenson

22  Report, at 9.)  Plaintiff has received two courses of treatment for

23  Hepatitis C while in DOC custody.  (Ct. Rec. 58, Ex. D, ¶ 14.)

24     14.  Prior to arriving at AHCC, Plaintiff began treatment for

25  Hepatitis C on October 28, 2002, which was discontinued on March 7,

26  2003, because Plaintiff was not responding.  (*Id.*)  None of the

27  Defendants were involved in the discontinuation of this treatment,

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
    JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
    JURISDICTION OF STATE CLAIMS - 9

1    and it is undisputed that this course of treatment is not the
2    subject matter of the instant lawsuit. (Ct. Rec. 45 at 5; Ct. Rec.
3    58, ¶ 14; Ct. Rec. 90, ¶ 14.)

4         15.   It is undisputed that Plaintiff requested re-treatment at
5    AHCC on February 5, 2004, and was told by a nurse not named in this
6    lawsuit that DOC did not provide Hepatitis C re-treatment. (Ct.
7    Rec. 58, Ex. E, Att. 4; Ct. Rec. 90, ¶ 15.)

8         16.   Plaintiff filed an "initial grievance" at AHCC requesting
9    Hepatitis C treatment in May 2004. (Ct. Rec. 68, Ex. A.)

10        17.   Medical staff who are not named in this lawsuit
11   investigated the grievance and reported June 18, 2004, the case
12   would be referred to CRC. (Ct. Rec. 68, Ex. G.) Defendant Clinton
13   investigated Plaintiff's appeal and referred the case to the CRC in
14   June or July 2004. (Ct. Rec. 58, Ex. B ¶ 8; Ct. Rec. 68, Ex. I.)
15   He was approved for treatment on September 14, 2004. (Ct. Rec. 58,
16   Ex. B ¶ 8, Ex. E, Att. 18.) Preliminary testing and Hepatitis C
17   education were requested at AHCC in September 2004, by a nurse who
18   is not named as a party to this action. (Ct. Rec. 58, Ex. E, Att.
19   18.)

20        18.   Plaintiff's second course of treatment began on December
21   23, 2004, at MCC. (Ct. Rec. 58, Ex. E, Att. 18, 19.)

22        19.   The Hepatitis C treatment was discontinued at MCC on
23   August 31, 2005, by an infection control nurse and physician, due to
24   an increase in Plaintiff's viral load.  The medical providers
25   responsible for stopping the treatment are not named in this
26   lawsuit.

27        20.   Plaintiff's medical expert, Dr. Goldenson, included the
28   MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
     JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
     JURISDICTION OF STATE CLAIMS - 10

following information regarding Hepatitis C treatment in his report:

> Current recommendations state that patients who are started on a combination therapy should have their viral load checked at 12 weeks. Those patients who do not show a 2-log response to therapy (>100 fold decrease in the amount of virus) should have their therapy discontinued. Those having a 2-log response should have their therapy continued for a total of 48 weeks. There should not be any breaks in the treatment. If there is a significant break (i.e., one month) therapy needs to be restarted and continued for a full 48 weeks. Some experts recommend that those patients who continue to have detectable HCV RNA (despite the 2-log reduction) should undergo repeat testing at 24 weeks. Treatment can be discontinued in those patients who still have virus present at 24 weeks (since the likelihood of a sustained response following a complete course of treatment is only about 4 percent), while those who are negative should complete the course of therapy.

(Ct. Rec. 64, Ex. 4, Goldenson Report, at 9.) (Footnotes omitted.)

Dr. Goldenson also reported Defendant's viral load was 1.23 million IU/ml when treatment began on December 20, 2004. After 12 weeks of therapy (March 7, 2005), the viral load was 639 IU/ml, and 4480 IU/ml after 24 weeks of therapy (June 6, 2005). On August 31, 2005, the infection control nurse consulted with Dr. Khurshids from the DOC Infection Control Committee, who decided to discontinue the treatment due to this increase in viral load. (*Id.* at 7.)

21. On September 29, 2005, the CRC reviewed Plaintiff's Hepatitis C treatment and recommended treatment be re-started, (a one-month interruption). Defendant Kenney was on the CRC panel that ordered the restart. (Ct. Rec. 58, Ex. E, Att. 24, 27, 40.) Treatment was restarted on or about October 10, 2005. (Ct. Rec. 58, Ex. E, Att. 24.)

22. On January 4, 2006, testing showed Plaintiff's viral load was increasing again. On March 16, 2006, the CRC, which included

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 11

Defendant Kenney, determined Plaintiff ineligible for further treatment on the basis of two unsuccessful courses of treatment and the fact that Plaintiff was scheduled for release at the end of 2006. (Ct. Rec. 58, Ex. E, Att. 41.) (The CRC Report states: "[P]laintiff does not have adequate time to complete treatment before release and the group opined that re-treatment at this time is not likely to be successful.") It is disputed why Plaintiff failed to respond to treatment. Plaintiff claims it was because treatment was interrupted by Defendants. (Ct. Rec. 90 at 4.)

23. It is disputed whether Plaintiff ever responded successfully to Hepatitis C treatment.

### Left Foot

24. On January 8, 2004, Plaintiff saw Defendant Clinton about his foot pain. She referred Plaintiff's case to a PA, who is not named as a party, for evaluation and possible treatment. (Ct. Rec. 58, Ex. E, Att. 3.)

25. Plaintiff's foot was x-rayed on January 12, 2004. Spokane Radiology reported on January 27 "no abnormalities noted." (Ct. Rec. 58, Ex. C, Att. 29.) Plaintiff states he filed complaints and grievances in February 2004, complaining of extreme pain in his foot. (Ct. Rec. 68, ¶ 149.) He does not dispute the x-ray and radiology report in the record.

26. Plaintiff's foot was examined by an unnamed physician on February 26, 2004; no abnormality was found. Plaintiff asked for special boots, was refused and offered insoles instead. He was prescribed Motrin for pain. (Ct. Rec. 58, Ex. E, Att. 5.) Plaintiff states he filed numerous complaints after this exam.

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 12

27.  On March 9, 2004, Plaintiff's left foot was examined by an unnamed PA; no nodule was found.  On March 10, x-rays were taken and no abnormalities were found.  (Ct. Rec. 58, Ex. E. Att. 6, 30.)

28.  Plaintiff met with Defendant Clinton on March 23, 2004, who ordered insoles to help the pain.  The insoles were issued to Plaintiff on May 7, 2004.  Plaintiff states he filed numerous grievances and complaints regarding the pain.  (Ct. Rec. 58, Ex. E, Att. 7, 8; Ct. Rec. 68, ¶¶ 162-74.)

29.  On May 19, 2004, an unnamed PA diagnosed Plaintiff with Morton's neuroma of the left foot.  "Morton's neuroma" is a non-cancerous growth of nerve tissue in the foot, usually between the third and fourth toes.  (Ct. Rec. 64, Ex. 4, Goldenson Report, at 8.)  Plaintiff was given a metatarsal pad for his shoe to help relieve the pain.  (Ct. Rec. 58, Ex. E, Att. 9, 10.)  Plaintiff states the metatarsal pad fell off in the shower and his foot condition worsened. (Ct. Rec. 68, ¶¶ 175-76.)

30.  On June 25, 2004, an unnamed PA recommended Plaintiff see Orthopedics for left foot evaluation.  (Ct. Rec. 58, Ex. E, Att. 13.)

31.  It is disputed whether Plaintiff was issued a second set of insoles.

32.  On July 14, 2004, Plaintiff was examined by orthopedist Dr. Bowton, referred by an unnamed PA.  Dr. Bowton noted Plaintiff "was not interested in therapeutic injection." (Ct. Rec. 58, Ex. E. Att. 53, 55.)  Plaintiff disputes, saying injections were not offered and "would not have helped."  It is undisputed that Dr. Bowton stated he would consider neuroma exploration or excision, and

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 13

Plaintiff would "best be served" by a local foot specialist or podiatrist. (Ct. Rec. 58, Ex. E, Att. 55; Ct. Rec. 68, Ex. YY.)

33. On July 15, 2004, Plaintiff was seen by a PA whose progress note indicates Plaintiff reported walking two hours per day. Plaintiff's left foot case was referred to CRC for a podiatry evaluation and possible surgery. (Ct. Rec. 58, Ex. E, Att. 15, 16, 54.) Plaintiff alleges he was in constant pain due to the foot. (Ct. Rec. 68, ¶ 180.)

34. On July 21, 2004, CRC determined a podiatry referral was not medically necessary. (Ct. Rec. 58, Ex. E, Att. 34, 35.)

35. On April 18, 2005, Defendant Sanford resubmitted the podiatry referral request to CRC. The 12-member CRC, composed of four doctors, three PAs, and five ARNPs, included Defendant Kenney, and again determined podiatry referral was not medically necessary. (Ct. Rec. 58, Ex. E. Att. 37, 38.)

36. There is no documentation of foot pain thereafter, until October 24, 2005. Plaintiff states he sent grievances prior to the April 18, 2005, referral, and complained of pain throughout July 2005, and alleges Defendant Sanford "failed to properly document his complaints." (Ct. Rec. 68, ¶¶ 212, 214.)

37. Plaintiff does not controvert that on October 24, 2005, Defendant Sanford examined Plaintiff's left foot, found no abnormalities and observed Plaintiff able to walk without difficulty. (Ct. Rec. 58, Ex. Att. 25; Ct. Rec. 90 at 6.)

38. Defendant Sanford refused Plaintiff's request for an eight-inch boot as not medically necessary because Plaintiff had a six-inch boot. (Ct. Rec. 58, Ex. E, Att. 25.)

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 14

39.  Defendant Sanford ordered a repeat x-ray of Plaintiff's foot at the October 24, 2005, examination; the x-ray showed no abnormalities. (Ct. Rec. 58, Ex. E, Att. 31, 32.)

**Ventral Hernia**

40.  When Plaintiff was first transferred to AHCC in October 2003, he had an intake screening with an unnamed nurse; Plaintiff did not indicate he was having problems or pain with his ventral hernia. (Ct. Rec. 58, Ex. A, Att. 1.)  Plaintiff disputes, saying his medical history was available to AHCC and showed he had a ventral hernia, and the records should have been reviewed.  It is undisputed that he did not mention ventral hernia at intake. (Ct. Rec. 90, ¶ 36.)

41.  According to DOC records, on March 9, 2004, Plaintiff first complained of a ventral hernia to an unnamed PA at AHCC. (Ct. Rec. 58, Ex. E, Att. 6.)  Plaintiff disputes, stating that he first complained of the hernia on February 25, 2004, and made eight complaints prior to March 9, 2004.  His allegation is supported by an "offender complaint/initial grievance," dated February 26, 2004. (Ct. Rec. 68, Ex. N.)

42.  It is disputed whether Plaintiff complained of his hernia on July 15, 2004, at a physical exam. (Ct. Rec. 58, Ex. E, Att. 15; Ct. Rec. 68, ¶ 68.)

43.  Plaintiff was transferred to MCC on November 18, 2004, and met with a nurse for intake screening on November 22, 2004. Plaintiff identified his significant medical problems as Morton's neuroma in his left foot with the main symptom being it "hurts to climb." (Ct. Rec. 58, Ex. E, Att. 2.)

44.  On August 1, 2005, Plaintiff mentioned his hernia to Defendant Sanford, but did not seek treatment on that date.  This is undisputed. (Ct. Rec. 58, Ex. E, Att. 20.)

45.  On September 13, 2005, Plaintiff mentioned his hernia to Defendant Sanford. (Ct. Rec. 58, Ex. E, Att. 22; Ct. Rec. 90, § 43.) Plaintiff disputes, alleging he asked Defendant Sanford to look at it and she refused.  (Ct. Rec. 90, ¶ 41.)

46.  On October 24, 2005, Plaintiff mentioned his hernia to Defendant Sanford when complaining about shoulder and foot pain. Plaintiff was advised to select one issue to discuss and sign up for sick call to discuss other issues.  He elected to discuss foot pain.

47.  Defendant Sanford conducted an abdominal examination on November 20, 2005.  She noted "protrusion mid-upper abdomen when patient sits up. Is able to sit up direct and straight without difficulty or any evidence of significant discomfort.  Area flat when patient is sitting or lying down."  Plaintiff states he was seeking treatment for the hernia that day.  (Ct. Rec. 58, Ex. E. Att. 26.)  Defendant Sanford noted on November 20, 2005, "hiatal hernia ok." (*Id.*)

**Shoulder Pain**

48.  On January 8, 2004, Plaintiff first complained of right shoulder pain in an appointment with Defendant Clinton, who referred Plaintiff to an unnamed PA for evaluation and possible treatment. (Ct. Rec. 58, Ex. E, Att. 5; Ct. Rec. 90 at 7.)

49.  Plaintiff was seen by an unnamed PA on February 26, 2004, for shoulder pain.  Medical notes indicate he was told to keep the shoulder active; ibuprofen was prescribed and a lidocane injection

was planned if ibuprofen proved unsuccessful.  (Ct. Rec. 58, Ex. E, Att. 5.)  Plaintiff states he was told his pain was in his head despite four complaints prior to the exam.  (Ct. Rec. 68, ¶ 102.)

50.  Plaintiff was seen by an unnamed PA on March 9, 2004; his chief symptom was an inability to throw a ball.  He was referred to physical therapy.  (Ct. Rec. 58, Ex. E. Att. 6, 44.)

51.  On March 18, 2004, Plaintiff began physical therapy; he was seen on March 25, April 1, 8, 15, and 29, 2004.  On April 29, he was discharged at his request.  (Ct. Rec. 58, Ex. E. Att. 45-47.) Plaintiff alleges he completed the six-week session and it was not working.  (Ct. Rec. 68, ¶¶ 120-22.)

52.  On May 21, 2004, Plaintiff's right shoulder was examined by an unnamed PA.  It had full range of motion with pain at the end point, strength equal bilaterally and some shoulder tenderness.  He was prescribed Naprosyn and again referred for physical therapy.

53.  Plaintiff began physical therapy on June 3, 2004, with an unnamed physical therapist.  Plaintiff was discharged on July 15 or 16, 2004. (Ct. Rec. 58, Ex. E, Att. 50-52; Ct. Rec. 68, ¶¶ 123, 127.)

54.  On July 15, 2004, Plaintiff was seen by an unnamed PA; it was noted he had full range of motion bilaterally.  (Ct. Rec. 58, Ex. E, Att. 16.)

55.  On August 5, 2004, Plaintiff was advised of pros and cons of shoulder injections by a PA; he did not request injection at that time.  (Ct. Rec. 58, Ex. E, Att. 16; Ct. Rec. 90, ¶ 53.)

56.  On November 18, 2004, Plaintiff was transferred to MCC. At medical intake, he did not indicate he had pain in his right

shoulder or a history of shoulder pain. (Ct. Rec. 58, Ex. E, Att. 2; Ct. Rec. 90 ¶ 54.) This is undisputed.

57. On October 24, 2005, four months after Plaintiff filed the Complaint in the captioned matter, Plaintiff mentioned his right shoulder pain to Defendant Sanford, and complained about his hernia and foot pain. Defendant Sanford advised him to select one issue and sign up for sick call to discuss the other issues. Plaintiff elected to discuss foot pain. (Ct. Rec. 58, Ex. E, Att. 25; Ct. Rec. 90, ¶ 55.)

58. Harold Clarke was the Secretary of the Department of Corrections for Washington State from February 2005 through the filing of the Complaint. Under the OHP, the Secretary or his designee has to authorize Level III care.

**C.    Washington State Department of Corrections Offender Health Plan (OHP)**

Plaintiff first alleges that the OHP is unconstitutional because it "fails to provide affirmative procedures to guide employees in providing a reasonably prudent standard of care which leads to deliberate indifference towards a prisoner's serious medical needs in violation of the Eighth Amendment." (Ct Rec. 63 at 11-12.)

There is a recognized presumption of the constitutionality of state regulations. *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 718 (1981). Even where regulations arguably impinge on a prisoner's civil liberties, it is settled that correctional authorities have wide discretion in matters of prison administration; a reasonable exercise of legitimate discretion is

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 18

1  not unconstitutional.  *Smith v. Schneckcloth*, 414 F.2d 680, 681 (9th

2  Cir. 1969).

3      Plaintiff makes the broad assertion that OHP definitions do not

4  comport with constitutional standards, but cites no authority in

5  support of his claim.   The OHP sets forth health care procedures

6  and  definitions  that  apply  to  offenders  for  whom  the  DOC  is

7  responsible.  (Ct. Rec. 64.)  Under the OHP, Level I care is care

8  that is "medically necessary," as defined above.   If the medical

9  care is emergent and estimated to cost less than $25,000, Level I

10 care can and should be authorized without delay by any DOC medical

11 provider.   If the emergency care is estimated to cost more than

12 $25,000, the OHP provides that any DOC medical provider can and

13 should authorize initial care; once initial care is authorized, the

14 case must be referred to CRC or the HSD, as soon as possible.  Non-

15 emergent  medically  necessary  care  costing  under  $25,000  can  be

16 authorized by a DOC primary care provider (PCP); if the cost exceeds

17 $25,000, the case must be referred to the CRC; only CRC or the HSD

18 are  entitled  to  authorize  this  category  of  care.   Level  II  is

19 "medically necessary" care which may be authorized when medically

20 appropriate. It is authorized only by CRC or HSD, upon referral, on

21 a case-by case basis.  Level III care is care that does not fit the

22 "medically necessary" criteria and is significantly less likely to

23 be cost-effective or produce substantial long-term gain.  Level III

24 care can be authorized by the Secretary or designee on a case-by-

25 case basis or at prisoner's own expense if certain conditions are

26 met.  (Ct. Rec. 64, Ex. 2, 3.)

27     The  OHP  definitions  and  levels  of  care  criteria  are

28

1   administrative guidelines used to structure the delivery of medical
2   care and address the need for cost containment in the prisons
3   managed by DOC.  This is a legitimate penological goal.  *See Roberts*
4   *v. Spalding*, 783 F.2d 867, 870 (9ᵗʰ Cir. 1986).  Given the deference
5   that must be shown by federal courts to a State's administration of
6   prisons,[3] Plaintiff's conclusory and broad assertion that the OHP is
7   unconstitutional, without more, does not rebut the presumption of
8   constitutionality afforded to state and federal regulations.  *Turner*
9   *v. Safley*, 482 U.S. 78, 89-90 (1987). Plaintiff's claim that the OHP
10  is unconstitutional fails.

11  **D.   Defendant Clarke and Prospective Injunctive Relief**

12       Relying on *Ex parte Young*, 209 U.S. 123 (1908), Plaintiff
13  claims Defendant Clarke, as Secretary of DOC, can be sued in his
14  official capacity and enjoined for implementing and supervising an
15  unconstitutional regulation.  (Ct. Rec. 93 at 4.)  *Ex parte Young*
16  stands for the proposition that the sovereign immunity of the State
17  under the Eleventh Amendment does not bar suits against state
18  officers, where the state official attempts to enforce an
19  unconstitutional statute.  The Supreme Court held that a state
20  official enforcing an unconstitutional statute loses his "official
21  character" as a state actor and, thus, his Eleventh Amendment
22  immunity.  Without his Eleventh Amendment immunity, he can be
23  brought constitutionally before the court by a party seeking

24  _____

25       [3]  *Procunier v. Marinez*, 416 U.S. 396, 404-04 (1974);
26  *Schneccloth*, 414 F. 2d at 681; *Snow v. Gladden*, 338 F.2d 999, 1001
27  (9th Cir. 1964); *Bresolin v. Morris*, 88 Wn.2d 167, 169 (1977).

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
    JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
    JURISDICTION OF STATE CLAIMS - 20

1  injunctive relief. *Ex parte Young*, at 159-60. However, the Court
2  also held that no injunction should be awarded by a federal court
3  against the enforcement of an allegedly unconstitutional state law
4  unless the case is "reasonably free from doubt." *Id.* at 166. As
5  discussed above, Plaintiff's claim that the OHP is unconstitutional
6  is conclusory and without legal support.

7      Under the Eleventh Amendment, a State cannot be sued in federal
8  or state court by a citizen unless the State or state agency has
9  consented to the action. *Alden v. Maine*, 527 U.S. 706, 713 (1999).
10 Here, the State has not consented to suit. Defendant Clarke
11 implements and supervises the OHP as part of his official duties
12 and, thus, in his official capacity. As discussed above, Plaintiff
13 has not rebutted the presumption of constitutionality of the OHP;
14 therefore, the rule allowing injunctive relief under *Ex Parte Young*
15 does not apply. Defendant Clarke must be dismissed with prejudice
16 as a party to this action.

17 **E.  Section 1983 Claims--Eighth Amendment[4]**

18     To state a claim under 42 U.S.C. § 1983, at least two elements
19 must be met: (1) the defendant must be a person acting under color
20 of state law; and (2) his conduct must have deprived the plaintiff
21 of rights, privileges or immunities secured by the Constitution or
22 the laws of the United States. *See Parratt v. Taylor,* 451 U.S. 527,
23 535 (1981) (overruled in part on other grounds by *Daniels v.*

24 _____

25     [4]  Plaintiff does not claim substantive due process claims or
26 equal protection claims under the Fourteenth Amendment. (Ct. Rec.
27 93 at 6 n.1.)

28 MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
   JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
   IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
   JURISDICTION OF STATE CLAIMS - 21

*Williams*, 474 U.S. 327 (1986).  Implicit in the second element is a third element of causation.  *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 286-87 (1977).  To establish an Eighth Amendment violation due to inadequate medical care, Plaintiff must show "deliberate indifference" by prison officials to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The record must show "an acute physical condition, the urgent need for medical care, the failure or refusal to provide it and tangible residual injury." *Schneckcloth*, 414 F. 2d at 681; *Stiltner v. Rhay*, 371 F.2d 420, 421 (9th Cir. 1967).

Failure or refusal to provide medical care constitutes an Eighth Amendment violation only under exceptional circumstances that approach failure to provide care at all.  *Shields v. Kunkel*, 442 F.2d 409, 410 (9th Cir. 1971).  Examples cited by the Ninth Circuit of constitutionally egregious circumstances include: where police prevented treatment of bullet wounds, resulting in amputation of the prisoner's leg; arresting and holding a person "incommunicado" with a broken neck and other bodily injury; jailers denying a prisoner treatment for injury sustained while working in the jail kitchen, resulting in his permanent paralysis.  *Stiltner*, 371 F.2d at 421 n.3.[5]  Where the record shows only a difference of opinion as to

---

[5]   In *Stiltner*, plaintiff was a prisoner with chronic back pain resulting from an automobile accident in 1958.  The court held the condition was painful, but it also was chronic.  Plaintiff was permitted to visit the prison hospital many times, given medication and physical therapy which did not help the prisoner's back and

1  treatment or diagnosis, and not a refusal to provide treatment, the
2  complaining party does not state a claim under § 1983.  *Shields*, 442
3  F.2d at 410.  The Supreme Court in *Estelle* held "a complaint that a
4  physician has been negligent in diagnosing or treating a medical
5  condition does not state a valid claim of medical mistreatment under
6  the Eighth Amendment.  Medical malpractice does not become a
7  constitutional violation merely because the victim is a prisoner."
8  *Estelle*, 429 U.S. at 106.

9       Under the "deliberate indifference" standard, Plaintiff must
10  show Defendants knew of and disregarded an excessive risk to his
11  health and safety.  "Deliberate indifference" requires more
12  culpability than ordinary lack of due care for a prisoner's health.
13  *Farmer v. Brennan,* 511 U.S. 825, 835 (1994).  The "deliberate
14  indifference" standard is less stringent in medical treatment of
15  prisoner cases than cases involving other types of harm to
16  incarcerated individuals.  *McGuckin v. Smith*, 974 F.2d 1050, 1060
17  (9th Cir. 1992)(overruled on other grounds).  First, there must be
18  (1) a "purposeful act or failure to act on the part of the
19  defendant" and (2) the denial/failure must be harmful.  *Id.*  The
20  prison official has to know of and disregard an "excessive risk to
21  inmate health or safety" to be deliberately indifferent.  *Farmer*,
22  511 U.S. at 837.  A finding that an individual sat idly by as

23  _____

24  neck.  The court concluded: "[P]laintiff's allegations show only
25  that he has not been receiving the kind and quality of medical
26  treatment he believes is indicated" and held such a claim was not
27  cognizable under the Civil Rights Act.  *Stiltner*, 371 F.2d at 421.

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
    JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
    JURISDICTION OF STATE CLAIMS - 23

another human being was seriously injured despite defendant's ability to prevent the injury is "a strong indicium of callousness and deliberate indifference." *McGuckin*, 974 F.2d at 1060; *Ortiz v. City of Imperial*, 884 F.2d 1312, 1313-14 (9th Cir. 1989) (summary judgment reversed in part because inaction of doctors resulted in inmate's death); once these two prerequisites are met, the fact-finder determines whether defendant was "deliberately indifferent."

Deliberate indifference to a serious medical need exists if the official's intentional refusal or failure to treat a prisoner's condition would result in the "unnecessary and wanton infliction of pain" or would be "repugnant to the conscience of mankind." Estelle, 429 U.S. at 105-06. The court applies an objective test and a subjective test in assessing claims of deliberate indifference. *Helling v. McKinney*, 509 U.S. 25, 35-36 (1993). Under the objective test, the plaintiff must show that defendant's acts were so grave as to violate contemporary standards of decency. The claimed "deliberate indifference" of medical personnel must offend the "evolving standards of decency." *Estelle,* 429 U.S. at 103. Under the subjective test, the court must focus on what the prison official actually perceived, not what he or she should have known. *Farmer,* 511 U.S. at 837. Eighth Amendment liability requires consciousness of a substantial risk of serious harm, including serious damage to the prisoner's future health, and a knowing disregard of that risk. *Id*. at 843; *see also Helling*, 509 U.S. at 35. Even if prison officials know of a substantial risk to an inmate's health, they may not be found liable if they responded reasonably to the risk, even if the harm was not averted. *Farmer,*

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 24

1   511 U.S. at 844-45.

2       In addition to "deliberate indifference," Plaintiff must show
3   there was a causal connection between the Defendants acts or
4   omissions and the alleged constitutional deprivation.  This can be
5   established by proof of direct personal participation, or by proof
6   that a defendant set into motion "a series of acts by others which
7   the actor knows or reasonably should know would cause others to
8   inflict the constitutional injury." *Stevenson v. Koskey*, 877 F.2d
9   1435, 1439 (9th Cir. 1989).  To be liable, a defendant must commit
10  an affirmative act or fail to perform a duty that she is legally
11  required to do, and which causes the constitutional deprivation.
12  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Plaintiff must
13  set forth specific facts showing the causal connection and the
14  alleged harm.  Conclusory allegations are inadequate to establish
15  personal participation.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th
16  Cir. 1980).  The facts must be individualized and focus on the
17  duties and responsibilities of the named defendant.  *Leer v. Murphy*,
18  844 F.2d 628, 633 (9th Cir. 1988).  Liability under 42 U.S.C. § 1983
19  cannot be based on supervisory responsibility or position.  *Monell*
20  *v. New York City Dept. of Social Services of City of New York*, 436
21  U.S. 658, 694 n.58 (1978).

22  **F.   Section 1983 Claims Against Defendants Clinton, Sanford and**
    **Kenney**
23

24      Plaintiff claims each Defendant at some time during the
25  relevant period violated his Eighth Amendment rights by showing
26  deliberate indifference to his medical conditions.  Defendants
27  respond Plaintiff presents no probative evidence of their personal

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
    JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
    JURISDICTION OF STATE CLAIMS - 25

involvement in his complained of treatment, purposeful refusal or failure to treat or residual tangible injury as a result of the care received. It is undisputed that Defendants Clinton, Sanford and Kenney were prison officials acting in their official capacity during the relevant times. Each Defendant had varying degrees of involvement with Plaintiff's medical needs, so the acts of each Defendant must be analyzed under the applicable legal standards in determining whether summary judgment is appropriate for the respective claims against the named Defendants.

## 1.  **Defendant Clinton**

It is undisputed that Defendant Clinton was the Health Center Manager (HCM) at AHCC and provided health care at the clinic on an as-needed basis during the relevant time of October 6, 2003, to November 18, 2004. As HCM, her role was supervisory, but when she was seeing patients at the clinic, she was authorized to provide medically necessary treatment. (Ct. Rec. 103, Clinton Deposition, at 17.) In her role as HCM, she reviewed and investigated Level II grievances filed by Plaintiff during his stay at AHCC; as HCM, she typically did not order treatment. (*Id.* at 21.) Rather, the matter would be referred to the AHCC medical director.[6]  Grievances reviewed by Defendant Clinton included Plaintiff's complaints regarding treatment for the medical needs at issue here.

### Hepatitis C

It is undisputed Plaintiff filed a grievance, which was

_____

[6] The AHCC medical director during the relevant time is not a party in this action.

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 26

investigated by persons not named in this action, and filed an appeal regarding Hepatitis C treatment at AHCC in May 2004. As HCM, Defendant Clinton reviewed Plaintiff's appeal and referred the Hepatitis C case to CRC. The CRC, after investigation and evaluation, approved treatment on September 14, 2004. Preliminary testing was done at AHCC, and treatment was restarted in December 2004, after Plaintiff was transferred to MCC. (Ct. Rec. 58, Ex. E, Att. 18; Ct. Rec. 68, Downing Decl., Ex. G, I, L.)

Plaintiff's medical expert, Dr. Goldenson, opined there should be no interruption in Hepatitis treatment. He also indicated a new treatment was preferred at time Plaintiff was at AHCC, *i.e.*, a "combination therapy with pegylated interferon and ribavirin." (Ct. Rec. 64, Ex. 4, Goldenson Report, at 8; *see also* Ct. Rec. 58, Ex. E, Att. 18, September 21, 2004, entry.) Submissions by Plaintiff show that the CRC at AHCC recommended and approved this new therapy on September 14, 2004.

The interruption in therapy referenced by Dr. Goldenson in his report occurred at MCC between August 31, 2005, and September 29, 2005, when it was restarted by the CRC at MCC. (Ct. Rec. 64, Ex. 4, Goldenson Report, at 7.) Defendant Clinton was not involved in the alleged interruption.[7] Plaintiff does not present specific, individualized facts to show Defendant Clinton personally

---

[7] It is undisputed that an infection control nurse and physician at MCC, who are not named as parties, made the decision to stop the Hepatitis C treatment. Fact 19, *supra*; Ct. Rec. 58, Ex. E, Att. 21.)

participated in the Hepatitis C treatment at AHCC, or set into motion any acts leading to the alleged constitutional deprivation. Rather, he makes the vague assertion that "[i]t is reasonable to conclude that [Defendant Clinton] was aware of his hepatitis C condition." (Ct. Rec. 93 at 8.)  To hold prison officials with supervisory positions liable, it must be shown that they had direct responsibility for the actions of the employees who engaged in the alleged misconduct. *See Rizzo v. Goode*, 423 U.S. 362, 375-76 (1976).  Plaintiff has failed to provide evidence that Defendant Clinton was personally involved in providing Hepatitis C treatment at AHCC.  Further, there is no evidence that there was a deliberate refusal or failure to provide the new treatment.

Even if Defendant Clinton's minimal contact in referring the case to CRC were found to be personal involvement within the meaning of the case law, the evidence presented shows that Defendant Clinton acted reasonably, as a matter of law, and consistent with her responsibilities as HCM when she referred the case to CRC.  The referral resulted in restarting of the treatment.  Her actions do not demonstrate an "intentional refusal or failure to treat a prisoner's condition" that would result in the "unnecessary and wanton infliction of pain" or would be "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105-106.  Further, the second prong to "deliberate indifference" is a showing that the alleged indifference caused resultant harm. *Jett v. Penner*, 439 F.3d 1091,

1096 (9th Cir. 2006).[8]

Dr. Goldenson states that failure to treat or an interruption in treatment of Hepatitis C can result potentially in liver disease, liver cancer and death; he does not state that his examination of Plaintiff revealed disease or other resultant harm. (Ct. Rec. 64, Ex. 4, Goldenson Report, at 8.)   Plaintiff, thus, has failed to provide probative evidence of the essential element of resultant harm in his Hepatitis C claim.   Defendant Clinton is entitled to summary judgment on claims relating to Plaintiff's Hepatitis C treatment.

**Ventral Hernia**

It is undisputed that during intake at AHCC, Plaintiff did not indicate he was having problems with his ventral hernia. (Fact 40, *supra*.) According to medical records, Plaintiff first complained of a hernia to a PA in March 2004 and again on July 15, 2004.   It is undisputed that Plaintiff filed grievances regarding medical

---

[8] In *Jett*, a case relied upon by Plaintiff in his argument, plaintiff submitted probative evidence of defendants' purposeful refusal to treat and resultant harm.   The court stated, "[T]he record is replete with evidence showing the delay was harmful."  The objective evidence included radiology reports that plaintiff's thumb, which was fractured while he was housed in a California prison, was deformed because the fracture was set incorrectly, creating a genuine issue of fact as to whether the prison doctors' treatment and delay in referring him to an orthopedist caused the deformity.  *Jett*, 439 F.3d at 1098.

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 29

treatment of his hernia, which were reviewed by Defendant Clinton. (Ct. Rec. 103, Clinton Deposition, at 33; Ct. Rec. 68, ¶ 53-67.) Plaintiff does not present evidence that Defendant Clinton provided personal treatment for the hernia.  Her supervisory role as HMC is not a basis for civil liability in this action. Defendant Clinton states in her Declaration that Plaintiff did not consult with her in her role as clinician for his hernia.  (Ct. Rec. 58, Ex. B, ¶ 15.) Plaintiff provides no probative proof of purposeful and specific acts or omissions by Defendant Clinton relating to the hernia.  He alleges medical staff told him the prison would not fix his hernia, but provides no support for this allegation.  Further, his allegations of pain and limitations in his "every day normal activities" are unsupported by evidence.  (Ct. Rec. 68, Downing Decl., Ex. KK.)

Plaintiff reported to Dr. Goldenson in October 2005, after filing the Complaint in the captioned matter, that he had had his hernia for about two to three years, noticing it when he was weightlifting. He described the pain as severe when he strained. (Ct. Rec. 64, Ex. 4, Goldenson Report, at 7.)   Even accepting Plaintiff's allegations that he was in pain, Plaintiff's condition was chronic and there is no evidence that there was an urgent need for medical care at AHCC. Plaintiff has failed to provide probative proof of essential elements in his § 1983 claim against Defendant Clinton for constitutionally inadequate hernia treatment.

### Shoulder Pain

On January 8, 2004, Defendant Clinton saw Plaintiff at clinic when he complained of shoulder pain and referred him to a PA for an

evaluation of his shoulder.  It is undisputed that he was given
ibuprofen for the pain.  In March 2004, he complained he could not
throw a ball, and was referred to physical therapy.  Plaintiff
states he completed a six-week session.  In June 2004, he was
referred to physical therapy again by a PA, and received treatment
until July 15 or 16, 2004.  (Ct. Rec. 58, Ex. E, Att. 50.)  Medical
records indicate he had full range of motion and X-rays showed no
abnormalities.  (Fact 54, *supra*; Ct. Rec. 58, Ex. E, Att. 16, 30.)
Plaintiff does not dispute this evidence.  Rather, Plaintiff argues
the treatment yielded no results.  As discussed above, Plaintiff's
dissatisfaction with prescribed treatment does not state a
constitutional claim.

It also is undisputed that on November 18, 2004, at MCC intake
screening, Plaintiff did not report pain in his right shoulder or a
history of shoulder pain.  (Fact 56, *supra*.)  Although Plaintiff
claims intractable pain caused by his shoulder, the evidence of
record indicates his pain was neither frequent nor constant.
Plaintiff does not mention his shoulder pain again until September
13, 2005, when he was at MCC.  (Ct. Rec. 68, Downing Decl., ¶ 131,
Ex. TT.)  Dr. Goldenson's examination at MCC in October 2005, after
the filing of the Complaint in the captioned matter, and a year
after Plaintiff's transfer to MCC, indicated Plaintiff had decreased
flexion and abduction in his right shoulder due to pain.  Dr.
Goldenson noted no muscle wasting in the shoulder.  He opined, based
on the physical evaluation only, and review of medical records, that
Plaintiff was suffering from shoulder impingement or a rotator cuff
tear.  (Ct. Rec. 64, Ex. 4, Goldenson Report, at 6.)  However, there

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
JURISDICTION OF STATE CLAIMS - 31

1  is no proof of substantial injury or urgent need of medical care for

2  his shoulder while Plaintiff was at AHCC.

3      Plaintiff has presented no evidence that Defendant Clinton was

4  involved in treatment of his shoulder pain.  It is undisputed that

5  he sent grievances to her in her role as HCM; however, this does not

6  establish personal participation in his medical care.   Medical

7  providers identified as treating the shoulder pain are not named as

8  defendants.   The evidence presented also shows that Plaintiff

9  received treatment in the form of anti-inflammatory pain medication,

10 and two series of physical therapy and was advised of the pros and

11 cons of shoulder injections in August 2004.  (Fact 55, *supra*.)  He

12 was issued a lower bunk, two extra pillows and restricted to no

13 heavy lifting.   (Ct. Rec. 64, Ex. 4, Goldenson Report, at 4.)

14 Allegations that he did not receive treatment for his shoulder while

15 at AHCC are not supported by the evidence.  Plaintiff has failed to

16 establish the essential elements of personal participation and

17 deliberate failure or refusal to provide treatment by Defendant

18 Clinton in his § 1983 claim against her for medical treatment of his

19 shoulder.

20              **Left Foot Pain (Morton's neuroma)**

21     It is undisputed that Defendant Clinton saw Plaintiff as a

22 clinician regarding his left foot, and she referred him to a PA for

23 evaluation.  He was sent for X-rays, given insoles and metatarsal

24 pads to relieve the pain, and prescribed pain medication.  (Fact 24-

25 28, *supra*.)  He was referred by a treating PA to orthopedic surgeon

26 Eric Bowton, M.D., in June 2004.  (Fact 30-32, *supra*; Ct. Rec. 64,

27 Ex. 4, Goldenson Report, at 4.)  Dr. Bowton stated he would consider

28 MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
   JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
   IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
   JURISDICTION OF STATE CLAIMS - 32

neuroma exploration of excision as treatment for Plaintiff's neuroma. (Fact 32, *supra*.) Plaintiff argues that Defendant Clinton demonstrated deliberate indifference by failing to follow through with the recommended surgery.

Plaintiff has stated an example of a difference in "medical judgment" between Dr. Bowton and prison medical staff. (This is underscored later, at MCC, where the 12-member CRC, composed of four doctors, three PAs, and five ARNPs, determined podiatry referral was not medically necessary. Fact 35, referencing Ct. Rec. 58, Ex. E, Att. 37, 38.) This does not state a constitutional claim for several reasons. Although Plaintiff's evidence shows disagreement and dissatisfaction with the quality and the type of care given, the facts establish that Defendant Clinton, to the extent she was responsible for Plaintiff's treatment, did not ignore or refuse to treat Plaintiff's conditions. The facts of treatment are undisputed. "A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court [under the state tort claims act] . . . ." *Estelle*, 429 U.S. at 107. Plaintiff has failed to show a genuine issue of material fact as to whether there was a deliberate refusal of failure to treat his left foot within the meaning of federal law.

**2.  Defendant Kenney**

It is undisputed that Defendant Kenney is the Medical Director at MCC, and he has never personally treated Plaintiff. (Fact 7, *supra*.) As Medical Director, his role is primarily supervisory. (Ct. Rec. 65, Sloyer Decl., Ex. 5, Kenney Deposition, at 11.) He

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
JURISDICTION OF STATE CLAIMS - 33

also is a member of the CRC that reviewed Plaintiff's Hepatitis C case at MCC.    It is undisputed that Plaintiff's Hepatitis C treatment was interrupted between August 31 and September 29, 2005, by an infection control nurse and a physician at MCC who are not parties to this action.    (Fact 19, *supra*.)    Defendant Kenney's involvement in Plaintiff's medical care was as Medical Director of MCC and member the CRC that approved resumption of Plaintiff's Hepatitis C treatment in September 2005, after the one month interruption.[9]  (Fact 7, 21, *supra*.)  As a matter of law, Defendant

---

[9]    Plaintiff also appears to argue that Dr. Kenney's participation on the CRC that stopped his treatment in March 2006 (ten months after the filing of the Second Amended Complaint) creates a triable constitutional issue.  (Ct. Rec. 90, ¶ 21.)    For a variety of reasons, this argument fails.  Dr. Kenney's acts in 2006 occurred after Plaintiff's medical expert Dr. Goldenson examined Plaintiff in October 2005 and, therefore, his memorandum report submitted October 21, 2005, does not address this conduct. Morever, as explained by Plaintiff's medical expert, an increased viral load is considered by some experts to be a medical reason to stop treatment where a patient continues to test positive for detectable HCV RNA (despite the 2-log reduction) after 24 weeks, because the likelihood of sustained response following a complete course of treatment is only about four percent.  *See* Fact 20, *supra*.    Dr. Goldenson further stated that under "[c]urrent recommendations" with "combination therapy," patients "should have their therapy discontinued" if they "do not show a 2-log response to

MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL JURISDICTION OF STATE CLAIMS - 34

1   Kenney cannot be held liable under § 1983 on a *respondeat superior*

2   theory. *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir. 1982). The

3   evidence of record, when viewed in the light most favorable to

4   Plaintiff, does not establish a genuine issue of material fact as to

5   whether Defendant Kenney personally participated in Plaintiff's

6   medical treatment or intentionally failed or refused to provide

7   treatment for Plaintiff's Hepatitis C. Assuming Defendant Kenney's

8   participation on the CRC panel that authorized restarting Hepatitis

9   C treatment on September 14, 2005, arises to the level of personal

10  participation, this involvement, as a matter of law, is not evidence

11  of deliberate refusal or failure to provide medical treatment. In

12  fact, the opposite inference arises since the CRC panel authorized

13  restarting treatment.

14      Regarding Plaintiff's other medical conditions, he has not

15  presented individualized factual evidence to show Defendant Kenney's

16  personal involvement in the treatment of Plaintiff's ventral hernia,

17  shoulder pain or left foot pain. A letter to Defendant Kenney dated

18  March 23, 2005, indicates Plaintiff was dissatisfied with the

19  medical care he was getting. (Ct. Rec. 68, Ex. KK.) Defendant

20  Kenney was one voting member of the CRC that reviewed Plaintiff's

21  cases (see, *e.g.*, Fact 35), but Plaintiff does not provide probative

22  evidence that Defendant Kenney set into motion acts of others that

23  _____

24  therapy," that is, if the viral load does not reflect in excess of

25  100 times decrease in the viral numbers. *Id.* Thus, the decision to

26  stop treatment in 2006 arguably may rise to the level of malpractice

27  under state law, but does not create a triable constitutional claim.

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
    JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
    JURISDICTION OF STATE CLAIMS - 35

1   caused a constitutional deprivation, personally treated Plaintiff,
2   or knowingly disregarded an "excessive risk" to Plaintiff's health.
3   As discussed above, Dr. Kenney's supervisory role in the treatment
4   of medical conditions is not a basis for § 1983 liability.
5   Therefore, Defendant Kenney is entitled to summary judgment on the
6   federal claims against him.
7   **3.    Defendant Sanford**

8                              **Hepatitis C**

9        As discussed above, it also is undisputed that the medical
10  providers responsible for stopping Plaintiff's Hepatitis C treatment
11  at MCC are not named defendants.   There is no evidence presented
12  that Defendant Sanford was involved in that decision.   Plaintiff has
13  failed to present probative evidence as to the material fact of her
14  personal involvement in the refusal or failure to treat the
15  Hepatitis C; therefore, Defendant Sanford is entitled to summary
16  judgment for federal claims involving the Hepatitis C condition.

17       It is undisputed that Defendant Sanford was Plaintiff's primary
18  care provider while he was at MCC.   The medical reports show that
19  Defendant Sanford treated Plaintiff's left foot condition, examined
20  his ventral hernia, and was aware of his shoulder pain.   She was
21  authorized by the OHP to provide Level I care.   Therefore, Plaintiff
22  has established that Defendant Sanford was personally involved in
23  his medical treatment for the remaining conditions while at MCC.
24  The issue becomes whether any genuine issue of fact remains as to
25  whether Defendant Sanford was deliberately indifferent to
26  Plaintiff's medical needs and whether this alleged indifference
27  caused harm.

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
    JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
    JURISDICTION OF STATE CLAIMS - 36

**Ventral Hernia**

It is undisputed that Defendant Sanford conducted an abdominal examination on November 20, 2005, and noted "protrusion mid-upper abdomen when patient sits up. Is able to sit up direct and straight without difficulty or any evidence of significant discomfort. Area flat when patient is sitting or lying down," and specifically noted "hiatal hernia ok." (Ct. Rec. 58, Ex. E, Att. 26.) The material facts are whether the condition was a serious medical need, whether Defendant Sanford deliberately refused or failed to treat this condition, and whether the alleged indifference caused residual harm.

Dr. Goldenson's post-Complaint examination in October 2005, revealed a "2.5 x 2.5 inches, soft, reducible ventral hernia that was tender to palpation." Plaintiff reported he had had the hernia for about two to three years, and the pain was severe when he strained. He reported to Dr. Goldenson that he had been told by "medical staff that they would not fix his hernia while he was in prison." (Ct. Rec. 64, Ex. 4, Goldenson Report, at 7.) Dr. Goldenson opined that Plaintiff should have been offered "an abdominal binder" to "see if it would relieve his pain" and recommended Plaintiff be referred to a surgeon. (*Id.*) Dr. Goldenson did not identify significant resultant harm from the alleged lack of care. Plaintiff reported pain, but no resultant injury. (*Id.*)

Plaintiff offers no evidence to support his conclusory allegations that Defendant Sanford refused to treat him or refused to record his complaints in his record. Although Plaintiff alleges

1  that certain medical staff at MCC advised him that he needed care
2  for his hernia, there are no supporting affidavits from these
3  individuals.  Conclusory allegations in Plaintiff's Declaration are
4  not sufficient to create a genuine issue of fact.  *Anderson*, 477
5  U.S. at 250.  Viewing Dr. Goldenson's report in the most favorable
6  light, Plaintiff fails to present probative evidence that raises a
7  genuine issue of material fact as to whether Defendant Sanford
8  deliberately refused or failed to treat his ventral hernia, whether
9  the hernia caused intractable pain or whether the alleged failure or
10 refusal caused him residual harm within the meaning of federal law.
11 Defendant Sanford is entitled to summary judgment on the federal
12 claim regarding Plaintiff's ventral hernia.

13                          **Shoulder Pain**

14      As discussed above, it is undisputed that on November 18, 2004,
15 at MCC intake screening, Plaintiff did not report pain in his right
16 shoulder or a history of shoulder pain.  (Fact 43, 56, *supra*.)  The
17 only evidence presented to support Plaintiff's allegations in his
18 Declaration that he suffered shoulder pain is Dr. Goldenson's report
19 which indicated decreased flexion and abduction due to pain and no
20 muscle wasting.  Dr. Goldenson opined, based only on the physical
21 examination and record review, that Plaintiff was suffering from
22 shoulder impingement or a rotator cuff tear.  (Ct. Rec. 64, Ex. 4,
23 Goldenson Report, at 6.)  Dr. Goldenson opined that for patients who
24 do not respond to physical therapy, rest, and medication, the "next
25 option" is therapeutic steroid injections and surgery.  He did not
26 find that Plaintiff's alleged lack of treatment was the direct cause
27 of residual harm.

28 MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
   JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
   IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
   JURISDICTION OF STATE CLAIMS - 38

1  Medical evidence of record shows few references to shoulder

2  pain and no records indicating Defendant Sanford personally treated

3  Plaintiff for this condition. (Ct. Rec. 58, Ex. E, Att. 20, 25.)

4  According to Dr. Goldenson's report, Plaintiff stated he injured his

5  shoulder about two years prior to Dr. Goldenson's exam.    Dr.

6  Goldenson noted there was no documentation from MCC that the

7  shoulder pain was evaluated. (Ct. Rec. 64, Ex. 4, Goldenson Report,

8  at 3, 5.)    Plaintiff has presented no probative evidence to

9  establish that his shoulder pain, which he admitted was chronic,

10  presented an urgent need for additional medical care.    Further, he

11  has provided no probative and objective evidence of resultant harm

12  caused by Defendant Sanford's alleged deliberate indifference, which

13  could create an arguable issue of material fact.    Defendant Sanford

14  is entitled to summary judgment on the federal claim against her

15  relating to the shoulder condition.

16                     **Morton's Neuroma Left Foot**

17  As discussed above, Plaintiff was diagnosed with Morton's

18  neuroma in May 2004, while housed at AHCC, and seen by an

19  orthopedist in July 2004.    (Fact 29, 32, *supra*.)    Plaintiff alleges

20  he requested treatment at MCC, but Defendant Sanford failed to

21  properly document his foot pain and refused to treat his foot pain.

22  He submits a letter written to Defendant Kenney, dated March 23,

23  2005, in which he complained of the medical treatment for his foot,

24  shoulder and hernia.    (Ct. Rec. 68, Ex. NN.)

25  Medical records filed by Defendants indicate Plaintiff was seen

26  for foot problems while at MCC by Defendant Sanford.    The evidence

27  indicates she provided special work boots, x-rays, pain medication,

28  MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
   JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
   IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
   JURISDICTION OF STATE CLAIMS - 39

shoe inserts, and temporary release from work.  (Ct. Rec. 58, Ex. E, Att. 25, 26, 32, 39; Ct. Rec. 68, ¶ 137; Ct. Rec. 103-5, at 50.)  In April 2005, due to Plaintiff's continued complaints of pain, she determined he had failed conservative treatment and referred the matter to the CRC, which denied the referral for a podiatry evaluation.  (Ct. Rec. 58, Ex. E, Att. 38.)  Plaintiff reported to Dr. Goldenson on October 5, 2005, that his foot pain was,

> [N]ot very bad when he woke up in the morning, but would increase over the course of the day as he walked on it. He stated after a day's work the pain was a ten on a scale of ten, and he could barely walk on it for the rest of the evening.

Dr. Goldenson found on examination that Plaintiff "walked with a mild limp, on the left.  There was tenderness to palpation between his 4th and 5th toes.  There was no swelling, decreased sensation, or decreased range of motion."  (Ct. Rec. 64, Ex. 4, Goldenson Report, at 8.)  He concluded that Plaintiff had an atypical Morton's neuroma, and based on Plaintiff's report of pain, found Plaintiff continued to suffer from significant foot pain.  He did not identify other injury or resultant harm.

As discussed above, a prisoner must allege acts or omissions to evidence an indifference by prison officials that offends "evolving standards of decency" and is "repugnant to the conscience of mankind" to state a valid claim of medical mistreatment under the Eighth Amendment.  *Estelle*, 429 U.S. at 104 n.10 (deliberate indifference included prison doctor's choosing the easier treatment of throwing away the prisoner's ear and stitching the stump; injection of drug with knowledge that inmate was allergic and refusal of physician to treat the allergic reaction; prison doctor

refusing to administer prescribed pain killer to inmate after leg surgery, which was rendered unsuccessful by doctor's requiring inmate to stand, contrary to surgeon's instructions).

Claims of breach of duty by medical professionals or even gross negligence do not state a claim for constitutional violations under the Eighth Amendment. Failure or refusal to provide medical care constitutes an Eight Amendment violation only under exceptional circumstances that approach failure to provide care at all. *Shields* 442 F.2d at 410. Unless the circumstances are exceptional and the facts establish a level of care of no care at all, the claims do not warrant federal intervention and should be addressed under state tort claim law.

Although Plaintiff complains of chronic pain due to his foot, and there is decidedly a difference of opinion regarding the type of treatment for Plaintiff's neuroma, Plaintiff has failed to establish that Defendant Sanford was deliberately indifferent to his foot condition. She treated the foot condition with special shoes, x-rays, pain medication, shoe inserts, and temporary relief from work duties, and then referred the matter to the CRC for a specialist evaluation as required by the OHP. (Ct. Rec. 58, Ex. E, Att. 38.) Defendant Sanford reasonably responded to Plaintiff to the extent she could. Plaintiff's disagreement with Defendant Sanford's medical treatment decisions does not constitute probative evidence to prove a deliberate refusal or failure to provide medical care. Further, the objective evidence does not create a genuine issue of fact as to whether harm resulted from the claimed indifference. *See Jett*, 439 F.3d at 1096.

1      Viewing factual evidence of record in the light most favorable

2  to Plaintiff, Plaintiff fails to make a showing of the essential

3  elements in a § 1983 claim for inadequate medical treatment by

4  Defendant Sanford of his Morton's neuroma.

5  **G.   Supplemental Jurisdiction of State Claims**

6      Plaintiff also has alleged claims under Washington law for

7  negligence and professional malpractice.  (Ct. Rec. 45.)   Where

8  there are pendent state claims remaining after federal claims have

9  been  dismissed,  this  court  has  the  discretion  to  decline

10 jurisdiction.   28 U.S.C. § 1367(c)(3).   As the 42 U.S.C. § 1983

11 claims have been dismissed, no federal claims remain.

12     The negligence claims are clearly state law claims, governed by

13 RCW 7.70, *et seq.*  Matters of negligence under state law are more

14 properly decided by the state courts.  *United Mine Workers of*

15 *America v. Gibbs*, 383 U.S. 715, 726 (1966); *McKinney v. Carey*, 311

16 F.3d 1198, 1200 (9th Cir. 2002).   The running of the statute of

17 limitations has not been plead and there has been no allegation or

18 argument of the running of the statute of limitations.[10]   The

19 undersigned concludes that this defense has been waived and/or

20 Defendants now are estopped from proceeding with a statute of

21 limitations defense.   The court declines supplemental jurisdiction.

22 The negligence claims are dismissed without prejudice to proceeding

23 against the Defendants in state court.

24

25  _____

26     [10]  The  file  also  reflects  notices  of  claims  were  filed  by

27 Plaintiff.  (Ct. Rec. 35, Sloyer Decl., Att. A, B and C.)

28 MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
   JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
   IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
   JURISDICTION OF STATE CLAIMS - 42

### III. CONCLUSION

The undersigned is sympathetic with and shares in Plaintiff's frustration with the chain-of-command and/or committee approach to the delivery of medical care. Indeed, most can agree that it is, or should be, a national embarrassment and sorrow that despite the wealth of this nation, there remain questions of adequacy of health care for poor persons and for institutionalized persons. However, under the facts of record in the captioned case, these issues are not federal constitutional matters addressable by federal courts. Rather, improvement of the OHP process must be addressed through the legislature.

As Plaintiff has not presented facts sufficient to rebut the constitutionality of the OHP, Defendant Clarke must be dismissed as a party to this action. In addition, Plaintiff has not submitted probative evidence to support allegations of deliberate failure or refusal by Defendants Clinton, Kenney and Sanford to treat Plaintiff's medical conditions within the meaning of federal constitutional case law. Because summary judgment on federal claims has been granted for Defendants, the defense of qualified immunity will not be addressed. The remaining state claims of negligence against Defendants Clinton, Kenney and Sanford should be resolved in state court. Accordingly,

**IT IS ORDERED:**

1. Plaintiff's Motion for Summary Judgment (**Ct. Rec. 61**) is **DENIED**;

2. Defendants' Motion for Summary Judgment (**Ct. Rec. 56**) is **DENIED IN PART** and **GRANTED IN PART**;

3.   Defendant Clarke, sued in his official capacity as to the federal claims, is **DISMISSED WITH PREJUDICE**;

4.   Plaintiff's Complaint and federal claims as to Defendants Clinton, Kenney and Sanford are **DISMISSED WITH PREJUDICE**;

5.   Supplemental jurisdiction of state negligence claims is **DECLINED**;

6.   All State claims are **DISMISSED WITHOUT PREJUDICE** to proceeding in state court.

The District Court Executive is directed to file this Order and provide a copy to counsel for Plaintiff and Defendants.

Judgment shall be entered for Defendants **with each party to bear its own costs**, and the file **CLOSED.**

DATED October 26, 2006.


                    S/ CYNTHIA IMBROGNO
                UNITED STATES MAGISTRATE JUDGE


MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN PART, DISMISSING FEDERAL CLAIMS AND DECLINING SUPPLEMENTAL
JURISDICTION OF STATE CLAIMS - 44